STATE OF MINNESOTA

COUNTY OF HENNEPIN

Stephen Svendsen,
                Plaintiff,

FOURTH JUDICIAL DISTRICT

CIVIL DIVISION

Case Type: Retaliation and Negligent Referral
                Defamation
                Defamation Per se

                v.

Civil No. Not assigned

G4S SECURE SOLUTIONS (USA) INC.
                Defendant

## COMPLAINT

Stephen Svendsen for his Complaint against G4S Minnesota hereby alleges as follows:

1. Stephen Svendsen is a citizen of Minnesota with his residence at 1 West Lake Street Unit 308, Minneapolis, MN 55408.

2. (a)At all material times , Respondent, a Florida corporation with branch offices throughout the United States and a principal place of business in Jupiter, Florida, has been engaged in the business of providing security services to government and private entities.
(b) During the past calendar year , a representative period of time, Respondent , in conducting its operations described above in subparagraph (a), sold and performed services out of its principal place of business in Jupiter, Florida, valued in excess of $50,000 directly to customers located outside the State of Florida.
(c) At all material times, Respondent has been an employer engaged in commerce within the meaning of Section 2(2), (6) and (7) of The national Labor Relations Act (the Act).

1

EXHIBIT A

3. At all material times, Service Employees International Union Local 26 (the Union) has been a labor organization within the meaning of Section 2(5) of the Act.

4. At all material times, the following individuals held the positions set forth opposite their respective names and have been supervisors of Respondent within the meaning of Section 2(11) of the Act and agents of Respondent within the meaning of Section 2(13) of the Act:

> Fred Seleman - General Council for Labor Relations
> David Wackenhut - Manager, Field Support Midwest Region
> Rachael Sturgeon - Director Midwest Region
> Isaac Luten - General Manager St Paul MN
> Joe Bickford - General Manager Tulsa OK
> William Swafford - Operations Manager
> Joseph Kolle - Operations Manager
> Tanya Moryn - Human Resources Manager
> Christopher Kenealy - Area Supervisor
> Malvey Galusha - Area Supervisor
> Wade Berends - Site Supervisor Bearpath
> Darius Tedford - Site Supervisor Prime
> Karrie Tuzzolino - Site Manager Loring Towers
> Steve Borchers - Site Supervisor Atria

5. At all material times, Service Employees International Union Local 26  has had a bargaining agreement that in all aspects pertained to Svendsen's job at G4S.

6. That at all material times, G4S was an employer and subject to The Americans with Disabilities Act (ADA) Statute: 42 U.S.C. § 12203.

7. Svendsen was an employee of G4S from February of 2013 until sometime in 2015. G4S did not notify Plaintiff when he became a non employee. G4S did not notify Plaintiff when his health insurance was cancelled or provide COBRA notification.

8. Svendsen was a union member of SEIU Local 26 during this period.

9. Svendsen was assigned to the Vivint account on 4/1/14.

10. Svendsen was entitled to certain rights as a union member under the CBA (Collective Bargaining Agreement).

EXHIBIT A

11. G4S requested Svendsen provide a post order revision for Vivint in August of 2013. G4S gave Svendsen the entire security set documents for Kanbar Towers in Tulsa OK by emailing them to Svendsen's personal email address. Svendsen delivered a desktop application to G4S Area Supervisor Malvey Galusha around 11/1/13.

12. Svendsen was asked by the union in January of 2014 to build smartphone applications of the CBA agreements.

13. Svendsen reported intimidation and harassment by G4S officer James Christy to G4S Bearpath Supervisor Berends on 1/29/14.

14. Berends took home an ipad Svendsen gave him to assess viability of using IOS for credentialing and document solutions at Bearpath the week end of 2/1/14.

15. Svendsen discussed the results of his week end shift using the ipad to check in visitors with Berends on 2/3/14.

16. Svendsen notified Isaac Luten G4S General Manager for Minnesota on 2/10/14 that he was building a CBA smartphone application for the union.

17. Svendsen experienced renewed and intensified harassment by Christy in his position at Bearpath after disclosing to Isaac Luten that he was building a CBA application.

18. Svendsen reported being harassed in a cooperative and organized fashion at Bearpath soon after disclosing to Luten that he was building a CBA application.

19. Svendsen reported harassment at Bearpath in March of 2014 that included denying Svendsen scheduling and medical accommodations that other officers were receiving.

20. Svendsen repeatedly reported harassment at Bearpath that included being spoken to in a demeaning and extremely intimidating way and in an ongoing fashion by Christy.

21. Svendsen provided G4S documents in March of 2014 that went to proving his allegations of harassment and disparate treatment.

22. On 3/18/14 G4S Manager Chris Kenealy showed up unexpectedly at Bearpath at the beginning of Svendsen's shift ostensibly for no reason in particular and visited with Svendsen for about 3 hours.

23. Retaliation against Svendsen intensified after he reported potential payroll fraud issues to

EXHIBIT A

G4S Manager Kenealy.

24. Kenealy made false statements about the March 18, 2014 meeting and other matters to Svendsen's union, co workers, and national G4S officials in a report dated 5/5/14 and many other false, damaging, and defamatory statements.

25. Kenealy's 5/5/14 intentionally false statements are so damaging as to render Svendsen unsuitable to work in the security industry.

26. Kenealy made statements in his report that were false, were known to be false when he made them, harmful to Svendsen's reputation in the community, harmful to Svendsen in his work, made at an improper time, and distributed to Svendsen's union and coworkers, stating;

> From: "Christopher Kenealy" <christopher.kenealy@usa.g4s.com>To: "Isaac Luten" <isaac.luten@usa.g4s.com>
> Cc: "Tanya Moryn" <tanya.moryn@usa.g4s.com>
> Subject: Steve Svendsen complaint

Here is a chronological order of all of the written communications in the folder, as well as some phone conversations and in-person meetings.

Each highlighted number below refers directly to the attached document with the same name.

Let me know if I can provide further information.

-Chris

Bearpath timeline:

1)   01-31-2014 - Original concern expressed by Wade: (#1)

2)   02-03-2014 - Meeting set-up with Supervisor Berends to talk about concerns with Officer Svendsen to take place on 02-04-2014 (#2)

3)   Kenealy asked Berends to have statements from all officers who have experienced issues with Officer Svendsen. Supervisor Berends provided a single "collective" document, written by Officer Christy, who has had most interaction with

4

EXHIBIT A

Svendsen (assigned to the same shift hours). Officer Christy wrote a summary of his experiences with Svendsen and submitted that to Berends. Berends gave it to Kenealy. Kenealy reviewed the document and submitted to Parry Swafford (Operations Manager). (#3)

4)    02-04-2014 – Conversation / Meeting With Supervisor Berends and Area Supervisor Kenealy. Berends related concerns:

a.    Svendsen and Officer Christy had had some sort of disagreement around a "snow concern" and (on a different day) the LRT gates being closed.

b.    Svendsen developing an App that could be loaded onto an iPad (or similar device) that would contain resident names, addresses, and Svendsen had eluded to photographs that were covertly taken as they approach the gate. (Berends removed the database from the computer for fear of misuse by Svendsen)

c.    Svendsen later complained that the database was removed from the computer.

d.    Svendsen posts in his daily log that he "built an Interactive PDF" to do daily logs (the only device compatible with this platform at the time was his handheld iPad.

e.    Berends concerns were mostly related to the fact that resident information was being misused and that Svendsen would not "stop" (either working on his project or trying to convince him and his peers how beneficial it was).

5)    03-15-2014 (Saturday) – Officer Svendsen arrived to work to find a S.O.R. posted over the sign-in sheet on the bulletin board. (Posted material is attached as #4)

6)    03-15-2014 (Saturday) – Officer Svendsen leaves a copy of the posting he found over the sign-in sheet in Supervisor Berrend's "tray," along with a letter requesting a written response. (#5)

7)    03-16-2014 (Sunday) – Officer Svendsen reports to work and finds the notes he placed in his S.O.R. the day before had post-it notes placed on them and it was left-out for him to find. The notes were apparently written by Officer Christy. (#6)

8)    03-16-2014 (Sunday) – Svendsen compiles another "package" for Supervisor with a letter that now uses the terms "courts" "workplace Intimidation" and "Harassment." Further, the letter suggests that he bring-in Human Resources to help

EXHIBIT A

him navigate workplace rules.  Included with the package, Svendsen submitted a photo of his name-plate being upside-down, as well as the Christy posting from the day before. (#7)

9)    03-17-2014 (Monday) -  Officer Klugherz called Area Supervisor Kenealy at the office. Explaining to him that Svendsen "interrogated" him about a posting left on the bulletin board on 03-15-2014. Klugherz expressed that there was something "obsessed" or not normal about the veracity of the questions. Finally Klugherz left the post (Svendsen was his relief), but said that once he was driving away and even after he got home, he began to feel very "uneasy" about Svendsen's temperament. He said Svendsen was coming-off unreasonably angry and seemed convinced that Klugherz (himself) had something to do with the posting.

10)   03-17-2014 (Monday) – Kenealy spoke with Berends on the phone about the phone call he received from Klugherz. Berends acknowledged that he had heard there were problems over the weekends as well (Berends and Kenealy both work Mon-Fri). Kenealy decided to come to the account on 03-18-2014 to talk with Svendsen directly.

11)   03-18-2014 (Tuesday) – Kenealy arrived to talk with Svendsen at approximately 1400 hours (Berends shift was over and he was just leaving). Apparently Berends and Svendsen had some conversation leading-up to Berends departure. Kenealy asked Svendsen to talk about what was going on that would be causing issues at the account. Svendsen made the following points:

a.    The resident database was removed from the computer. He felt his ability to do his job was being interfered with.
b.    The posting by Christy that he found on 03-15-2014
c.    The fact that the "package" he left for Berends was missing from his "Tray" on Sunday.
d.    the name-sign being upside-down on 03-16-2014
e.    Through the course of a three hour conversation, Svendsen didn't stray much from the "Interactive PDF" or APP that he was making – It clearly seemed to be the most important part of the conversation to him.
f.    Svendsen indicated that photos could be uploaded so there would be a "Photo ID" of each of the residents on their profile in the database. When Kenealy indicated that most residents probably wouldn't want their family being photographed, he indicated that it could easily be done by covertly taking photos as they stopped at the

6

gate to pass-through by nonchalantly aiming the device's camera at them.

g.    When Kenealy would redirect or appear to agree with Berend's decision or direction to stop working on the PDF file while at work, Svendsen would then challenge Kenealy's direction, or seemed to think that everyone else was wrong, or "just didn't understand."

h.    Svendsen also seemed to allege that there was some collusion happening between Christy and Berends, and that changes were being made without notifying him (Svendsen) even though his hours weren't changing….only the post he was working that night.

i.    Svendsen stated he has a neck or spinal injury that prevents him from working comfortably in the patrol vehicle. Kenealy asked him for a doctor's note Svendsen acknowledged one was not yet on file).

j.    Kenealy further instructed Svendsen to communicate anything at all that made him feel as though he was not being treated fairly (since Berends now seemed to be a subject in Svendsen's complaint). Svendsen begrudgingly agreed to do so.

k.    It should also be noted that the "tone" of the conversation and the questions Svendsen wanted answers to were clearly pointed at fishing for details he could use to make a complaint. Much of it was speculation on his part that he was finding avenues to bring them into the truth.

12)   *This entry was out of chronological order and moved below

13)   03-20-2014 – Svendsen emailed Kenealy with the subject line "Time Sensitive" reporting that he had forgotten an item in the patrol vehicle and that he had to return to the site to retrieve it. Christy had apparently found the item and left in Svendsen's tray already. Not being a "normal" scheduled patrol shift, Svendsen began to question Klugherz in regards to what was going on (Svendsen had seen the patrol vehicle leaving property as he arrived). Svendsen eluded to Christy being allowed to re-work his schedule or to request time-off when Svendsen's requests have been "ignored." (Email Conversation is attached as #9)

i.    Christy had made arrangements with Berends apparently to work some extra hours because he was going to need to leave early later in the week. He was leaving the site to fuel the vehicle.

ii.    Svendsen made a list of questions in great detail he wanted Kenealy to retrieve answers to.

iii.    Kenealy again told Svendsen that he needed to be copied on anything that led him to feel he was being mistreated at work, including evidence of his day-off requests

EXHIBIT A

being ignored by a supervisor.

14)   03-20-2014 – Svendsen forwarded an email written on 01-22-2014, in which Svendsen is asking Berends to have a scheduled day-off for February 8th. The email is followed by another email telling Berends to disregard the request for time-off, written on the 28th. (Note: This is not an approved method for requesting vacation. Berends may not have seen this email. Svendsen has not provided evidence of a vacation request form having been submitted, but posits that it has been). (#10)

15)   03-24-2014 – Svendsen emails a request to Berends for a meeting because he had "questions" about something that had occurred on 03-24-2014 (despite Kenealy's instructions to communicate his concerns directly to the Branch Office). Kenealy asks both parties to suspend the meeting and redirects it here to the office / authorizes scheduling overtime or making schedule changes to accommodate. – Meeting scheduled for Thursday (03-27-2014), meeting invites sent to all parties, and now include Tanya Moryn (HR), Swafford, and Isaac Luten (GM) (#11)

16)   Svendsen called and objected to Kenealy's instruction to reschedule the meeting to be held in the office and wanted to know why the action was taken. Kenealy reminded Svendsen that he was not to be going directly to Berends, who continued to be at the crux of his complaints, and also said that the whole situation was now becoming very serious and wanted to involve Human Resources along with Office Management.

17)   Svendsen then sent an email to Kenealy, saying that he did not feel his complaint was getting due attention (despite the conversation that just occurred on the phone). He added that he wished to "withdraw his complaint." (#12)

18)   Svendsen replied back to the meeting notice sent moments before by Kenealy and agreed to keep-up work related communications, but said that he did not wish to participate in the meeting. (Svendsen saying he didn't wish to participate, was not cause to cancel the meeting. It was left on the calendar) (#13)

19)   03-26-2014 – Phone conversation documented with Svendsen, who was offended that Officer Christy highlighted a section of the Post Order manual that reminded him not to park the patrol vehicle in the exit-lane while visiting the Guard Shack.(#14)

20)   03-26-2014 – Berends provides a copy of a Doctor's note Svendsen brought to

EXHIBIT A

work with him. (Note was dated in 2008).

21)   03-26-2014 - Kenealy called to ask if Svendsen had any more recent documentation regarding his reported injury. Svendsen state he had an appointment with his Chiropractor coming up and would supply an updated note, including any restrictions. Svendsen wanted to bring-up the scheduled meeting and hoped to validate his reasons for not participating. During the course of the conversation, he felt Kenealy was "Silencing" him. He went on to say (after Kenealy said Isaac and HR would be involved in the meeting) "You tell Isaac that I feel like a Negro in the 30's who is protesting a lynching." Kenealy wrote a summary of the phone conversation and forwarded it to Isaac, at Svendsen's request. (#15)

22)   *From above - Kenealy asked Berends to submit his own time-line regarding incidents that happened that Steve seemed to be concerned with. (#8)

23)   Berends reports that he has discovered footage of Svendsen using his iPad while checking people in. He said in person there were many instances, but copied the best footage he could find and submitted it to Kenealy. Kenealy gave it to HR Mgr Moryn. (#8-A)

24)   03-27-2014 - Svendsen missed the meeting scheduled by Kenealy in lieu of his meeting on-site with Berends (this was the meeting Svendsen wrote back to say he didn't with to participate and withdrew his complaint on the same date).

25)   Some time around 03-27-2014 – Svendsen submitted a "New" doctor's note to Human Resources that had some restrictions on it. HR Manager Tanya Moryn asked Kenealy if he could accommodate a 2 hour shift in the Patrol Vehicle, to which Kenealy replied no. the shift is 8 hours in length. Officers at their own discretion can cover partial shifts based on a mutual agreement between both parties, but it would not be (or has it ever been) scheduled around a 2-hour rotation.

26)   03-29-2014 – Svendsen called Kenealy shortly after 1400 hours. Svendsen explained that Christy was trying to intimidate him into leaving before he could finish his daily report. He said he needed 5 minutes to finish. Kenealy asked to talk to Christy. Kenealy instructed Christy to leave him alone until he was finished so he could leave.

a.      Christy arrived early, as normal. Normal practice is for the oncoming guard to drive in, park at the clubhouse, retrieve the off-going officer's vehicle and drive it back

EXHIBIT A

up to the gate

b.      On this date, Svendsen stated he didn't want Christy to drive his vehicle.

c.      Christy drove his own vehicle to the clubhouse and walked back to the gate-house to accommodate Svendsen's wishes. He was still on-post before 1400 hours (his shift start-time)

d.      Svendsen refused to move from the computer, where Christy (at 1400 hours) now needed to "log-in." Svendsen stated that he wasn't finished with his Daily Report.

e.      Christy went outside to wait (frustrated, he removed himself from the situation)

f.      While outside, Officer Rice called Christy on his mobile phone and said he was going to be late (they were both scheduled for the same shift).

g.      Christy reported this to Svendsen, who now only appeared to be waiting for Officer Rice to arrive so he could get a ride to his vehicle at the clubhouse. Svendsen then got irritable and seemed to be implying that Christy was lying.

h.      Svendsen then decided to call Kenealy. Kenealy resolved the situation with Christy and hung-up the phone.

i.      Moments later, Svendsen called Kenealy back and wanted to know what was said and had more "Questions."

j.      Kenealy ended the conversation as he was in the midst of trying to conduct a personal transaction on his time-off (was literally signing-off on a vehicle purchase during both phone calls)

27)  03-29-2014 – Christy submitted a DAR that went into great detail about what happened the night before. (#16)

28)  03-30-2014 – Kenealy and Swafford went to the Bearpath account to participate in a meeting. During the meeting, Svendsen continued to push his complaint further, ask more questions designed to validate his perceived truths. Svendsen was found to be recording the conversation and placed on therefore placed on suspension, pending further review from the Leadership within the office. Kenealy stopped the conversation once Svendsen was found to be recording. Kenealy did not authorize Svendsen's recording, nor did he with to be recorded further.

29)  04-08-2014 – I called Svendsen to schedule an appointment here at the office to discuss the whole situation.

30)  04-09-2014 – Svendsen left a message, stating the meeting date of 04-11-14 won't work for him.

EXHIBIT A

31)  04-10-2014 – I responded via email and proposed a couple more times for either the 15th or 16th.

32)  04-11-2014 – Svendsen declined the meeting times, stating he wanted to wait on the Union people to be available. (#17)This company is part of the G4S group of companies. This communication contains information which may be confidential, personal and/or privileged. It is for the exclusive use of the intended recipient(s). If you are not the intended recipient(s), please note that any distribution, forwarding, copying or use of this communication or the information in it is strictly prohibited. Any personal views expressed in this e-mail are those of the individual sender and the Company does not endorse or accept responsibility for them. Prior to taking any action based upon this e-mail message, you should seek appropriate confirmation of its authenticity. This message has been checked for viruses on behalf of the Company.

27. On 3/29/14 there was an incident of intimidation against Svendsen at Bearpath.

28. There is an audio file of the 3/29/14 incident provided with this complaint.

29. Svendsen submitted a doctor's note to G4S HR Manager Tanya Moryn on 3/31/14 at 11:04 AM for a medical accommodation in his position at Bearpath.

30. Svendsen discussed the note with Moryn on 3/31/14 at approximately 1:00 PM and told her other officers were now getting this very accommodation.

31. On 3/31/14 beginning at 2:00 PM Svendsen was **unlawfully interrogated** at Bearpath by Operations Manager Swafford and Kenealy.

32. On 3/31/14 Kenealy suspended Svendsen on a fabricated rule violation and unsubstantiated conduct.

33. On 3/31/14 Swafford removed Svendsen from Bearpath for a fabricated and unsubstantiated rule violation.

34. On 3/31/14 Luten sent Swafford and Kenealy to remove Svendsen from Bearpath after they had unlawfully interrogated him.

35. There are 2 audio files of the 3/31/14 Bearpath meeting as exhibits to this complaint.

36. Kenealy filed a report on Svendsen and Bearpath with Luten on around 5/5/14.

EXHIBIT A

37. The Kenealy report contained false statements by Kenealy that Kenealy knew to be false.

38. The Kenealy report contained allegations (false) that if true rendered Svendsen unsuitable to work in the security industry.

39. Kenealy had maintained a secret file on Svendsen that was introduced in the 5/5/14 report.

40. The false statements in the 5/5/14 Kenealy report fall under the jurisdiction of Minn. Stat. 326.336.

41. There was a grievance meeting held with G4S on 5/8/14 at Local 26 to resolve the Bearpath issues.

42. An audio file of the 5/8/14 meeting is attached as an exhibit to this complaint.

43. G4S agreed on 5/8/14 to place Svendsen and set a meeting for 5/21/14.

44. G4S broke the promise to place Svendsen on 5/21/14.

45. G4S agreed at the 5/8/14 meeting to conduct an investigation into Bearpath payroll fraud.

46. G4S agreed at the 5/8/14 meeting to conduct an investigation into disparate treatment Svendsen received for medical accommodations and scheduling.

47. G4S agreed in the 5/8/14 meeting to conduct an investigation into retaliation.

48. G4S admitted at the 5/8/14 meeting that Luten had sent Swafford and Kenealy to Bearpath to remove Svendsen on 3/31/14.

49. G4S admitted at the 5/8/14 meeting that Kenealy had no cause to suspend Svendsen under any G4S regulation.

50. G4S admitted at the 5/8/14 meeting that Swafford had no cause to remove Svendsen from Bearpath.

51. G4S agreed at the 5/8/14 to pay Svendsen back wages.

EXHIBIT A

52. G4S Luten at the 5/8/14 meeting inexplicably put Kenealy in charge of the investigations and payment of back wages.

53. Luten agreed in the meeting to listen to the 7 minute audio file that spanned the Bearpath suspension transaction and featured Kenealy misbehaving. But he got out of his seat threatening to leave the meeting at the 1 minute 20 second mark.

54. Svendsen filed an internal G4S ECH complaint on around 5/12/14 alleging retaliation for payroll fraud reporting and the reporting of disparate treatment and other.

55. Svendsen met with G4S Moryn and union officials at G4S HQ on 5/21/14 in order to get immediate job placement.

56. Svendsen met Joe Kolle at the meeting who G4S hired to replace Swafford.

57. G4S removed Swafford as Operations Manager sometime following 5/8/14.

58. G4S removed Swafford as Operations Manager sometime prior to 5/21/14.

59. G4S agreed to place Svendsen at Prime and scheduled a meet and greet with G4S Prime Supervisor Darius Tedford for that afternoon.

60. Darius Tedford reported to David Wackenhut at the time of the 5/21/14 meet and greet.

61. Svendsen was not given the Prime position by G4S.

62. G4S repeatedly refused to provide detailed information to substantiate the reasons Svendsen was denied the post.

63. G4S did not provide the information on the denial until around 10/15/14.

64. David Wackenhut conducted an internal ECH investigation beginning 6/10/14 and notified Svendsen at that time.

65. Svendsen reported payroll fraud to Wackenhut.

66. Svendsen reported retaliation to Wackenhut.

67. Svendsen reported disparate treatment to Wackenhut.

EXHIBIT A

68. Svendsen indicated he could provide uncontrovertible evidence for the allegations if requested.

69. There was a grievance meeting held which Luten and Moryn attended on 7/10/14 to address the Prime slot denial.

70. Svendsen was promised a slot at Art Institute or other account and to be paid at his Bearpath rate.

71. Luten emailed the Area Supervisor for Art Institute instructing him to assist Svendsen in a meet and greet.

72. Luten reported to Fred Seleman via cell phone immediately after the 7/10/14 meeting ended.

73. Svendsen notified Wackenhut on Friday 7/11/14 that he would be filing a ULP on the following Monday if G4S did not agree to pay back wages in the interim.

74. Wackenhut stated on 7/11/14 that he was submitting his report to Corporate on the 17th and that back wages would be addressed at that time.

75.     On Monday 7/14/14 G4S Moryn broke the recorded promise Luten made on 7/10/14 to place Svendsen and pay him at his previous rate stating;

> "It's my understanding that Corporate has your situation under review. I think it is best if we just hold off for now until everything get's situated."

76. Wackenhut submitted his ECH report to Seleman around 7/17/14.

77. Seleman stated on 7/22/14;

> "Please keep in mind that, as we mentioned previously, the company is prepared to terminate Mr. Svendsen based on the results of our investigation if we cannot reach resolution."

1.  Svendsen filed a ULP against G4S SECURE SOLUTIONS (USA) INC. on 7/23/14.

2.  Seleman stated to Svendsen's union on 7/30/14;

    On Jul 30, 2014, at 9:59 AM, Fred Seleman<fseleman@usa.g4s.com> wrote:

EXHIBIT A

Francis:

Per our prior communications, attached is the termination notice that would
be issued, absent resolution. There is DVD showing Mr. Svendsen engaged in
some of the activities in question. We do not have a copy of the DVD, but if
you would like to schedule a time with Tanya to come to our office and review
the DVD, please let her know. There are no other investigation documents at
this time.

Fred

Steven Svendsen

G4S conducted an investigation, requested by you, concerning numerous
complaints you had about work activities at the Bear Path residential
community. As a result of the investigation, it was discovered that you
misappropriated customer private and/or confidential property to develop
an unauthorized database system. It was also discovered that you utilized
your own private iPad ( or similar tablet type device) to check in and/or track
Bear Path residents in clear violation of post orders, protocols and potentially
privacy laws, including but not limited to the provision on Confidential Material
in the Security Officer Handbook. You also suggested to G4S management
that you could secretly take photos of Bear Path residents, unbeknownst to
them, to populate the database you were building.

You have been previously verbally counseled that utilizing customer
confidential information and/or developing a database was unauthorized. Yet,
you continued to do so. Likewise, G4S' customer asked that you be removed
from your previous post for the exact same type of unauthorized activity.
Following your suspension from Bear Path, G4S sent you on an interview
for another customer account. The report from the interviewer was that you
spent the entire interview trying to "sell" your database rather than perform
the functions for which you were interviewing. Your interests are clearly not
aligned with those of G4S and your employment with G4S is terminated.

3. There was a **COMPLAINT AND NOTICE OF HEARING** served on G4S by the
Regional Director of The National Labor Relations Board on 9/26/14.

4. The Board alleged in it's complaint;

15

EXHIBIT A

(d) At the interview described in subparagraph (a), Respondent, by its Area Supervisor William Swafford or Area Supervisor Christopher Kenealy, threatened to send the Charging Party home without working his shift in retaliation for the Charging Party's request for Union representation .

(e) At the interview described in subparagraph (a), Respondent, by its Area Supervisor William Swafford or Area Supervisor Christopher Kenealy, denied the Charging Party's request for Union representation.

(f) At the interview described in subparagraph (a), after the Charging Partyrequested union representation, as described in subparagraph (c), Respondent, by its Area Supervisor William Swafford and Area Supervisor Christopher Kenealy, continued to conduct the interview described above in subparagraphs (a) and (b), even though Respondent denied the Charging Party's request for union representation as described above in subparagraph (e).

9. By-the conduct described above in paragraph 8, Respondent has been interfering with, restraining and coercing employees in the exercise of the rights guaranteed in Section 7 of the Act in violation of Section 8(a)(1) of the Act.

10. The unfair labor practices of Respondent described above affect commerce within the meaning of Section 2(6) and (7) of the Act.

5. On 9/26/14 G4S Moryn violated the CBA by denying Svendsen a position because of long term availability.

6. On 9/26/14 G4S Moryn violated Minnesota Labor Laws by denying Svendsen a position because of long term availability.

7. G4S placed Svendsen in a dangerous environment at the Loring Towers account on 10/1/14.

8. The previous guard contractor working at Loring Towers on 9/30/14 and before that date provided it's officer's with firearms.

9. The previous guard contractor working at Loring Towers on 9/30/14 and before that date provided it's officer's with bullet proof vests.

EXHIBIT A

10. The previous guard contractor working at Loring Towers on 9/30/14 and before that date did not require it's officers to go up on the floors for safety reasons.

11. G4S did not provide proper training or equipment to it's officers prior to working shifts at Loring Towers.

12. G4S did not provide it's officer's with firearms during October of 2014 when Svendsen was working there.

13. G4S did not provide it's officer's with bullet proof vests during October of 2014 when Svendsen was working there.

14. On 10/1/14 G4S Luten identified a special privilege G4S had with the union of a 2 week notice for site visits.

15. Svendsen conducted a G4S steward recruitment campaign between 10/1/14 and 10/17/14.

16. Svendsen conducted a steward recruitment campaign at G4S sites 10/1/14 and 10/17/14.

17. Svendsen identified serious saftey concerns during his 17 day site visit campaign.

18. A young female untrained G4S officer was assaulted at a motel 6 during this period and Svendsen was pursuing changes and publishing this to the members of his union.

19. Luten made repeated allegations of CBA violations for Svendsen's site visits during October.

20. Svendsen filed a ULP against his union and Luten alleging collusion in violating the Act on 10/30/14.

21. G4S terminated Luten on 10/31/14.

22. Svendsen made a good faith attempt at settlement with G4S prior to bringing this law suit.

EXHIBIT A

## COUNT I: NEGLIGENT REFERRAL

**A.**   Various G4S Secure Solutions [USA] Inc. management officials participated and contrived together to retaliate against Svendsen for reporting payroll fraud, reporting disparate treatment and for seeking medical accommodations applicable to **Minnesota Employment Laws** and for reporting **Labor Law violations**, and for reporting **CBA violations** and did so with false reports in negligent referrals.

**B.**   These false reporting negligent referrals went to Svendsen's co workers and union.

**C.**   These false reporting negligent referrals were known by G4S officials to be false at the time they were created.

**D.**   These false reporting negligent referrals were known by G4S officials to be false at the time they were distributed to Svendsen's co workers.

**E.**   These false reporting negligent referrals were known by G4S officials to be false at the time they were distributed to Svendsen's union.

**F.**   These false reporting negligent referrals that were known by G4S officials to be false at the time they were created and at the time they were distributed to Svendsen's co workers and union caused Svendsen great harm.

**WHEREFORE,** Plaintiff demands judgement against Defendants for **Negligent Referral** as follows:

1. As to count I, a statement published to union members and all Minnesota G4S officers that discloses and admits the conduct and statements and actions of Kenealy, Swafford, Berends, Seleman, Wackenhut, Moryn, and Luten against Plaintiff.

2. Compensatory damages in the amount of $250,000.

3. Pain and Suffering in the amount of $500,000.

4. Punitive Damages in the amount of $1,000,000.

5. Ongoing medical insurance coverage and care for a term of 20 years.

6. All other and further relief in the Plaintiff's favor that the Court deems just and equitable.

**EXHIBIT A**

## COUNT II: DEFAMATION

**A.** Various G4S Secure Solutions [USA] Inc. Management officials participated and contrived together to harm Svendsen in distributing defamatory statements.

**B.** These defamatory statements went to Svendsen's co workers and union.

**C.** These defamatory statements were known by G4S officials to be false at the time they were created.

**D.** These false defamatory statements were known by G4S officials to be false at the time they were distributed to Svendsen's co workers.

**E.** These defamatory statements were known by G4S officials to be false at the time they were distributed to Svendsen's union.

**F.** These defamatory statements that were known by G4S officials to be false at the time they were created and at the time they were distributed to Svendsen's co workers and union caused Svendsen great harm.

**WHEREFORE,** Plaintiff demands judgement against Defendants for **Defamation** as follows:

1. As to count II, a statement published to union members and all Minnesota G4S officers that discloses and admits the conduct and statements and actions of Kenealy, Swafford, Berends, Seleman, Wackenhut, Moryn, and Luten against the Plaintiff.

2. Compensatory damages in the amount of $250,000.

3. Pain and Suffering in the amount of $500,000.

4. Punitive Damages in the amount of $1,000,000.

5. Ongoing medical insurance coverage and care for a term of 20 years.

6. All other and further relief in the Plaintiff's favor that the Court deems just and equitable.

EXHIBIT A

## COUNT III: DEFAMATION PER SE

**A.** Various G4S Secure Solutions [USA] Inc. management officials participated and contrived together to harm Svendsen in distributing defamatory statements that directly identified his work in his profession and that would impair his ability to work in his profession.

**B.** These defamatory statements went to Svendsen's co workers and union.

**C.** These defamatory statements about Svendsen's profession and work were known by G4S officials to be false at the time they were created.

**D.** These false defamatory statements about Svendsen's profession and work were known by G4S officials to be false at the time they were distributed to Svendsen's co workers.

**E.** These defamatory statements about Svendsen's profession and work were known by G4S officials to be false at the time they were distributed to Svendsen's union.

**F.** These defamatory statements about Svendsen's profession and work that were known by G4S officials to be false at the time they were created and at the time they were distributed to Svendsen's co workers and union caused Svendsen great harm.

   **WHEREFORE,** Plaintiff demands judgement against Defendants for **Defamation Per se** as follows:

1. As to count III, a statement published to union members and all Minnesota G4S officers that discloses and admits the conduct and statements and actions of Kenealy, Swafford, Berends, Seleman, Wackenhut, Moryn, and Luten against the Plaintiff.

2. Compensatory damages in the amount of $250,000.

3. Pain and Suffering in the amount of $500,000.

4. Punitive Damages in the amount of $1,000,000.

5. Ongoing medical insurance coverage and care for a term of 20 years.

6. All other and further relief in the Plaintiff's favor that the Court deems just and equitable.

**EXHIBIT A**

Dated February 15, 2016



Stephen Svendsen
Pro se
1 West Lake Street #308
Minneapolis, MN 55408
(612) 840-7301
stephen.svendsen@me.com

The undersigned acknowledges that costs, disbursements, and reasonable attorney and witness fees may be awarded pursuant to Minn. Stat. 549.211 Subd. 2 to the party against whom the allegations in the pleading are asserted.

I declare under penalty of perjury that everything I have stated in this document is true and correct. This document was signed in Hennepin County Minnesota on February 15, 2016.



Stephen Svendsen

EXHIBIT A