STEPHEN SVENDSEN,                    Case No. 16-CV-0583 (PJS/HB)

                Plaintiff,

v.                                                      ORDER

G4S SECURE SOLUTIONS (USA) INC.,

                Defendant.

Lisa M. Lamm Bachman and Wyatt S. Partridge, FOLEY & MANSFIELD, PLLP, for plaintiff.

Kelly Eisenlohr-Moul, DINSMORE & SHOHL, LLP; and Jacalyn N. Chinander, MEAGHER & GEER, PLLP, for defendant.

Plaintiff Stephen Svendsen was employed as a security guard by defendant G4S Secure Solutions (USA) Inc. ("G4S"). In March 2014, G4S suspended Svendsen for surreptitiously recording a meeting with two of his managers. In April 2014, Svendsen's union filed a grievance protesting Svendsen's suspension. Three more grievances followed in May, June, and July 2014. In the process of responding to—and attempting to resolve—Svendsen's grievances, G4S emailed two documents to Svendsen's union describing some of the concerns that had led G4S to suspend Svendsen. Among other things, these two documents ("the Kenealy report" and "the Seleman letter") accused Svendsen of misappropriating client information and suggesting that he could secretly photograph the residents at a gated residential

community at which he worked.  Svendsen claims that these statements were defamatory.

In February 2016, Svendsen brought a pro se lawsuit against G4S in state court, asserting defamation and other claims.  *See* ECF No. 1-2 at 18-20; ECF No. 22 at 6-7.  G4S removed Svendsen's lawsuit to federal court, and the Court granted G4S's motion to dismiss all of Svendsen's claims, save for Svendsen's defamation claim.  The Court dismissed the defamation claim without prejudice, but gave Svendsen—now represented by counsel[1]—permission to "file an amended complaint that more clearly describes his claim for defamation."  ECF No. 33 at 3.

After Svendsen filed an amended complaint reasserting his defamation claim, G4S again moved to dismiss Svendsen's defamation claim on the grounds that it was preempted by § 301 of the Labor Management Relations Act ("LMRA").  The Court denied G4S's motion because the Court was unable to determine (based on the scant record existing at the time) whether resolving Svendsen's defamation claim would

---

[1]After G4S removed this case to federal court, Lisa M. Lamm Bachman and Wyatt S. Partridge of the law firm of Foley & Mansfield, PLLP, agreed to represent Svendsen after being contacted by the Pro Se Project.  ECF No. 20.  (The Pro Se Project is "a partnership between the United States District Court for the District of Minnesota and the Minnesota Chapter of the [Federal Bar Association]" that is intended "to increase access to the federal court system while at the same time addressing the unique challenges of *pro se* litigation."  *Rickmyer v. ABM Sec. Servs., Inc.*, No. 15-CV-4221 (JRT/FLN), 2016 WL 1248677, at *5 (D. Minn. Mar. 29, 2016).)  The Court again expresses its appreciation to Lamm Bachman and Partridge for volunteering to assist Svendsen in this matter.

require the Court to interpret a provision of a collective bargaining agreement ("CBA"). ECF No. 49 at 8. The Court indicated that after the parties completed discovery, G4S could move for summary judgment on any ground available to it. *Id.* at 9.

This matter is now before the Court on G4S's summary-judgment motion. G4S argues that the Kenealy report and the Seleman letter were absolutely privileged because G4S emailed them to Svendsen's union in connection with the grievance process. In addition, G4S argues that the Seleman letter was absolutely privileged as a pre-judicial-proceeding communication because G4S's attorney sent it to Svendsen's union attorney during pre-arbitration settlement negotiations. The Court agrees that the Kenealy report and the Seleman letter were absolutely privileged and therefore grants G4S's motion for summary judgment on Svendsen's defamation claim.

## I. BACKGROUND

G4S is a private security company that protects government entities, businesses, and gated and non-gated residential communities. Wackenhut Decl. ¶ 3. G4S hired Svendsen as a security officer in February 2013. Svendsen Dep. 60. After Svendsen started working for G4S, he became a member of SEIU Local 26 (the "Union"), which was a party to a CBA with G4S. *Id.* at 9, 98, 116-17; *see also* Seleman Decl. ¶ 6; ECF No. 73-1 (reproducing the CBA). Svendsen worked for G4S at three locations (called

"accounts") before G4S suspended him in March 2014.  *See* Svendsen Dep. 208;

Wackenhut Decl. ¶ 8.

### A. Cargill

Svendsen's first G4S posting was to Cargill, a multinational company

headquartered in Minnesota.  Moryn Decl. ¶ 8.  On his own initiative, Svendsen "almost

immediately" started to work on a software application that he thought could improve

G4S's operations at Cargill.  Svendsen Dep. 71-76.  Not long after, Svendsen discussed

this application with his supervisor and two Cargill employees.  *Id.* at 79, 81.  But

instead of being impressed with Svendsen's work, the Cargill employees were

"unhappy about the app."  *Id.* at 83-84.  The Cargill employees did not like the fact that

Svendsen had put confidential information in digital form on his personal iPad, which

Svendsen had then taken home.  *Id.* at 87-88.  After the meeting, Svendsen

"immediately" resigned his position at Cargill and accepted a transfer to another G4S

account.  *Id.* at 85-86, 97-98.  The next day, Svendsen's supervisor issued Svendsen a

written warning for putting confidential client data on his personal iPad.  ECF No. 70-5

at 2.

### B. Vivint

G4S then posted Svendsen to Vivint, a company that provided alarm systems.

Svendsen Dep. 99.  Svendsen remained at Vivint for several months.  But Vivint was

located in a dangerous neighborhood, and Svendsen thought that "there was a real void of effective supervision" at Vivint. *Id.* at 101, 107. Svendsen believed that "there were continuing issues with Mal[vey Galusha] [the G4S area supervisor to whom Svendsen reported] doing things . . . that were objectionable to the client." *Id.* at 113. Svendsen "want[ed] to review the way" that Galusha had set up the security officers' tours. ECF No. 70-8 at 8. Svendsen also believed that Galusha had "consulted no one [before] setting up the tours" and accused Galusha of not being "familiar with some basic and important aspects of managing the database functions of the setup." *Id.* Eventually, Svendsen requested a transfer out of Vivint. Svendsen Dep. 119.

## C. Bearpath

In November 2013, G4S granted Svendsen's request and offered Svendsen a transfer to Bearpath, a gated residential community in a Minneapolis suburb. *Id.* at 118-19. The new post "paid a little bit more," and Svendsen "wanted to work on documents." *Id.* at 119. He also thought he could improve G4S's "client files" at Bearpath. *See id.* So Svendsen accepted the transfer and started training at Bearpath in January 2014. *Id.*

Within a few weeks, Svendsen's direct supervisor (Wade Berends) expressed concern that Svendsen might not be a "good fit" for Bearpath. ECF No. 72-4 at 19. Svendsen and the other G4S officers at Bearpath clashed over proper parking

procedures, ECF No. 72-2 at 70; ECF No. 72-4 at 45; a malfunctioning light on one of the gates, ECF No. 72-4 at 22-23; a "snow issue" in the neighborhood, *id.* at 23-24; a posting in the gatehouse reminding officers to turn off the light in the gatehouse bathroom, ECF No. 73-6 at 90-91; Post-it notes that were left for Svendsen in the gatehouse, *id.* at 92-93; an occasion on which Svendsen's name plate was found upside down, *id.* at 95-97; and medical accommodations that were (or were not) made for some of the officers, ECF No. 70-9 at 70, 80.

While he was clashing with his fellow security officers, Svendsen was also pushing to modernize the document system at Bearpath. When Svendsen first started at Bearpath, the security officers had access to a digital spreadsheet with the name, address, and phone number of each Bearpath resident. Svendsen Dep. 131-32. But after Svendsen repeatedly complained about inaccurate data in the spreadsheet, Berends removed the spreadsheet from the gatehouse computer, forcing Svendsen and the other security officers to use an "even more degraded paper[] document" to check in residents. *Id.* at 132-33. Svendsen thought that this paper document was slower to use and even more out-of-date than the digital spreadsheet. *Id.* In addition, Svendsen was concerned that G4S did not have "any really good pictures" of "bad people" that were barred from Bearpath. *Id.* at 136.

To fix these issues, Svendsen wanted to create a digital system that would "solve all" of Bearpath's "document problems." *Id.* at 137. Again acting on his own initiative and not at the request of G4S, Svendsen built a digital "activity log" to track the comings and goings at Bearpath. *Id.* at 134. Svendsen also envisioned a new system where "[e]verything would be digital," "efficient," and "accurate"; resident information could be regularly and easily updated; security officers could "keep all [their] documents on [an] iPad and the [gatehouse] computer"; and security officers "could easily set up folders . . . with pictures . . . for people that were barred" from Bearpath. *Id.* at 135-38.

Svendsen pitched his "activity log" to Berends, but Berends declined to test it without the approval of Bearpath's board. *Id.* at 134-35. Svendsen agreed with Berends' directive. *Id.* But Christopher Kenealy, the area supervisor for Bearpath, didn't believe that Svendsen "was going to stop creating this database." Kenealy Dep. 79-80. Kenealy thought that the tools that Svendsen was developing could be useful, but there was "no way" that Bearpath would have "ever gotten permission, or even tried to get permission from the residents to take their photos of their family and put them into this database." *Id.* at 80. Kenealy was also concerned about the privacy implications of Svendsen putting confidential resident information on his personal iPad. *Id.* at 18-28, 36-37.

Things came to a head on March 31, 2014,[2] when Kenealy and another G4S

manager met with Svendsen to talk to him about "his inability to get along with his co-

workers, his confrontational attitude," and "the threat that management believed he

posed to the confidentiality of client data."  Wackenhut Decl. ¶ 8.  Halfway through the

meeting, Kenealy discovered that Svendsen was surreptitiously recording the meeting,

and Kenealy cut the meeting short.  Kenealy Dep. 61-64, 94.  Kenealy then suspended

Svendsen for recording the meeting and removed Svendsen from the Bearpath account.

Svendsen Dep. 141-42.

### D.  Svendsen's First Grievance & the Kenealy Report

On April 11, 2014,[3] Francis Rojas, a Union attorney, filed a grievance on

Svendsen's behalf alleging that G4S had "violated the CBA by removing [Svendsen]

from the [Bearpath] account without just cause."  ECF No. 71-3 at 3.  The grievance (and

Rojas's email to G4S forwarding the grievance) asked G4S to provide a copy of "[a]ll

and any documents that refer or relate to this grievance and issue, including but not

limited to . . . a copy of any internal employer communications, e-mails, notes,

documents, or memorandums."  *Id.* at 2-4.

---

[2]Kenealy's report describes this meeting as happening on March 30, but
Svendsen states that the meeting actually happened on March 31.  Svendsen Dep. 121.

[3]Rojas's email states that Svendsen filed the grievance on April 10, but the
grievance itself is dated April 11.  ECF No. 71-3 at 2-4.

In response to the grievance and Rojas's email, G4S asked Kenealy to prepare a report documenting his interactions with Svendsen and the other G4S officers at Bearpath. Kenealy Dep. 17. Kenealy did as he was asked, and G4S forwarded Kenealy's report to the Union on May 5, 2014. Moryn Decl. ¶ 12; ECF No. 71-4. This is the "Kenealy report," the first of the two communications that form the basis of Svendsen's defamation claim.

The Kenealy report described some of Svendsen's interactions with Kenealy, Berends, and G4S officers at Bearpath. *See* ECF No. 71-4 at 2-13. Svendsen claims that at least two statements in the Kenealy report were false and defamatory. Am. Compl. ¶¶ 32-36, 72. First, the Kenealy report accused Svendsen of having "[al]luded to photographs that were covertly taken as [Bearpath residents] approach[ed] the gate." ECF No. 71-4 at 4. And second, the Kenealy report accused Svendsen of suggesting that G4S's security officers could "covertly" obtain photos of Bearpath's residents "by nonchalantly aiming the device's camera" at Bearpath residents as they "stopped at the gate to [pass through]." *Id.* at 6.

On May 8, 2014, Svendsen met with two Union representatives and two G4S representatives to discuss his grievance. ECF No. 70-9 at 16. At this meeting, G4S conceded that Svendsen had not violated any G4S policy by recording his conversation with Kenealy. G4S also agreed to pay Svendsen for the time that he had missed on

account of his suspension and to allow Svendsen to interview for a new position at another G4S account.  ECF No. 73-6 at 43, 76.  This "closed" Svendsen's grievance.  *Id.* at 34; *see also* Svendsen Dep. 190.  But the détente between Svendsen and G4S did not last long.

### E.  Svendsen's Second and Third Grievances

On May 29, 2014, the Union filed a second grievance on Svendsen's behalf.  ECF No. 71-5 at 2.  This grievance claimed that G4S had violated the CBA's seniority requirements by not assigning Svendsen to an open position at "Prime," another G4S account.  *Id.*  The grievance also requested information about the seniority of the G4S officer who ultimately landed the Prime position.  *See id.*

On June 19, 2014, the Union filed a third grievance on Svendsen's behalf.  ECF No. 71-6 at 2.  This grievance again claimed that G4S had violated the CBA's seniority requirements by not giving Svendsen the Prime position.  *Id.*  The grievance also requested back pay and "[i]mmediate posting" to the Prime account.  *Id.*

### F.  The Wackenhut Investigation

In the meantime, G4S was conducting an internal investigation, prompted by a call that Svendsen had made on May 12, 2014, to G4S's Employee Complaint Hotline.  In that call, Svendsen complained about his suspension and alleged "payroll discrepancies."  ECF No. 70-2 at 2-4.  G4S assigned Svendsen's complaint to

David Wackenhut, a G4S regional manager.  Wackenhut proceeded to investigate

Svendsen's complaint over the next two months.  *See* Wackenhut Decl. ¶¶ 2, 4-11.

On July 14, 2014, Wackenhut reported the results of his investigation.  *See* ECF

No. 70-9 at 2-5.  On one hand, Wackenhut concluded that "Svendsen should not have

been suspended" from Bearpath for recording his conversation with Kenealy on

March 31 "because no G4S policy prohibited [Svendsen's] actions."  Wackenhut Decl.

¶ 11.  On the other hand, Wackenhut concluded that Svendsen's removal from Bearpath

was nevertheless "warranted" because of "a well-documented history of

Mr. Svendsen's inability to get along with his co-workers and supervisors and his

continued issue with taking G4S's clients' data without permission in order to build

computer applications on his personal electronic devices."  *Id.*  Wackenhut believed that

the "latter issue" was grounds for Svendsen's "immediate termination."  *Id.*

### G.  Initial Settlement Negotiations

As June gave way to July, Svendsen's grievances "remain[ed] unresolved."  ECF

No. 70-3 at 16 (communication from Svendsen to Wackenhut).[4]  So Rojas (the Union

---

[4]Svendsen's April 11 grievance was temporarily settled on May 8, but Svendsen
alleged that G4S violated the terms of that settlement by giving an open position at the
Prime account to an officer with less seniority.  ECF No. 73-6 at 34.  That was why
Svendsen filed his May grievance.  Then Svendsen filed his June grievance when G4S
"did not provide any response" to his May grievance.  *Id.*

attorney) and Fred Seleman (a G4S attorney) began communicating in an attempt to settle Svendsen's grievances and avoid the need for arbitration.

On July 15, 2014, Seleman spoke with Rojas and told her that G4S was willing to pay Svendsen $9,000 if Svendsen would drop his grievances and resign from G4S. Seleman Decl. ¶ 13.  Seleman also told Rojas that "the results of [Wackenhut's] investigation . . . were not favorable to Mr. Svendsen and could lead to disciplinary action, including termination."  *Id.*  Rojas "disputed G4S's ability to discipline Mr. Svendsen under the CBA . . . and [stated] that the Union would pursue another grievance if G4S terminated his employment."  *Id.*

On July 22, 2014, Rojas called Seleman "to communicate Mr. Svendsen's (and the Union's) counter-demand regarding settlement of the three grievances."  *Id.* ¶ 14.  One of the options that Svendsen offered was his resignation from G4S and his withdrawal of all his grievances in exchange for a "nearly $30,000" payment from G4S.  *Id.*

After Seleman got off the phone, he emailed Rojas back, upping G4S's settlement offer to $11,000 "in exchange for [Svendsen's] complete release of all pending or potential grievances, claims, etc. and agreement not to work for G4S again in the future."  ECF No. 73-7 at 2.  In the same email, Seleman also reiterated that G4S was "prepared to terminate Mr. Svendsen based on the results of our investigation if we cannot reach resolution."  *Id.*

*H.  Svendsen's Fourth Grievance & ULP Charge*

The next day, on July 23, 2014, the Union filed a fourth grievance on Svendsen's

behalf, now claiming that G4S had violated the CBA by threatening to fire Svendsen.

ECF No. 71-7 at 2-3.  The grievance asked for an apology from Seleman and a written

withdrawal of Seleman's threat to fire Svendsen.  *See id.*  That same day, Svendsen also

filed an unfair-labor-practices charge with the National Labor Relations Board claiming

that G4S had "illegally suspended" and "unlawfully threatened" to fire him.  *Id.* at 4.

*I.  More Settlement Negotiations and the Seleman Letter*

Two days later, on July 25, 2014, Rojas emailed Seleman with Svendsen's

response to G4S's latest settlement proposal.  Svendsen felt that the $11,000 that G4S

had offered was too low, and Svendsen wanted to "return to work" and "preserve[] the

right to continue with the grievances."  ECF No. 73-10 at 2.  But Rojas did not shut the

door on a possible settlement of Svendsen's grievances.  To the contrary, Rojas asked for

a mutual extension of the grievance deadlines to give Svendsen and the Union more

time to "get the information" they needed "to evaluate . . . potential settlement" of the

grievances.  *Id.*  Among other things, Svendsen and the Union sought a copy of

Wackenhut's "investigation documents."  *Id.*

Five days later, on July 30, 2014, Seleman replied to Rojas's July 25 email, stating

the following: "Francis: Per our prior communications, attached is the termination

notice that would be issued, absent resolution. There is [a] DVD showing Mr. Svendsen engaged in some of the activities in question . . . . There are no other investigation documents at this time." ECF No. 73-11 at 2. The attached draft termination notice would have informed Svendsen that his employment with G4S was being terminated because he had "misappropriated customer private and/or confidential property to develop an unauthorized database system," "utilized [his] own private iPad (or similar tablet type device) to check in and/or track Bear Path residents in clear violation of post orders, protocols and potentially privacy laws," and "suggested to G4S management that [he] could secretly take photos of Bear Path residents, unbeknownst to them, to populate the database [he] w[as] building." *Id.* at 5. This is the "Seleman letter," the second of the two communications that form the basis of Svendsen's defamation claim.

Rojas responded to Seleman's email by requesting more documents from G4S, including "[e]verything from the investigation David Wackenhut conducted." ECF No. 72-2 at 102-05. G4S and Svendsen "continued to engage in settlement discussions for the next six months until the grievances were eventually settled in or around February 2015." Seleman Decl. ¶ 19.

One year later, Seleman filed this lawsuit.

## II.  STANDARD OF REVIEW

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  As a general rule, the non-movant's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  But a dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Id.* at 248.  And a dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

## III.  ANALYSIS

G4S argues that it is entitled to summary judgment on Svendsen's defamation claim for five reasons:  First, the Kenealy report and the Seleman letter were absolutely privileged because G4S sent both documents to Svendsen's union in connection with the grievance process.  Second, the Seleman letter was also privileged as a pre-judicial-proceeding communication because G4S's attorney sent it to a Union attorney during pre-arbitration settlement negotiations.  Third, Svendsen's defamation claim is preempted by § 301 of the LMRA.  Fourth, some of the statements in the Seleman letter were not statements of fact that can be proven true or false.  And fifth, Svendsen's

defamation claim is barred by a six-month contractual-limitations period.  The Court

agrees with G4S's first two arguments and thus dismisses Svendsen's complaint.

*A.  Grievance Privilege*

As the Court noted in its June 2017 order, "virtually every federal court to

address the issue has recognized an absolute privilege for statements made by an

employer to a union during a grievance process."  ECF No. 49 at 5 (citing *Hyles v.*

*Mensing*, 849 F.2d 1213, 1217 (9th Cir. 1988); *Hasten v. Phillips Petroleum Co.*, 640 F.2d 274,

277-79 (10th Cir. 1981); *Rovai-Pickett v. HMS Host, Inc.*, No. C-08-1625, 2008 WL 3977706,

at *2 (N.D. Cal. Aug. 26, 2008); *Harrigan v. Caneel Bay, Inc.*, 745 F. Supp. 1122, 1130

(D.V.I. 1990); *Green v. Hughes Aircraft Co.*, 630 F. Supp. 423, 427-28 (S.D. Cal. 1985);

*Brooks v. Solomon Co.*, 542 F. Supp. 1229, 1233-34 (N.D. Ala. 1982)).  The reason for this

privilege is threefold: (1) "it is federal policy to promote industrial stabilization through

collective bargaining agreements"; (2) "arbitration of labor disputes under such

agreements is 'part and parcel of the collective bargaining process itself,'" and

(3) allowing defamation lawsuits predicated on statements made during grievance

proceedings "would tend to interfere with frank and strong statements of positions in

such proceedings."  *Hasten*, 640 F.2d at 278-79 (quoting *United Steelworkers of America v.*

*Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578 (1960)); *see also Hyles*, 849 F.2d at 1217

("To allow state defamation claims based on statements made in grievance proceedings would weaken the grievance system as a means of industrial self-government.").

The scope of this privilege is extremely broad. The privilege does not cover statements that were made "*before* any grievance existed." *Mike v. Ron Saxon Ford, Inc.*, 960 F. Supp. 1395, 1399 (D. Minn. 1997). But it is not limited to statements made in a formal grievance hearing. Rather, the privilege applies to any statements that are made "*during* the grievance process," *id.*, or "in connection with" the grievance process, *Green*, 630 F. Supp. at 428. This includes statements made "at a conference or bargaining session having for its purpose the adjustment of a grievance . . . or other peaceable disposition of such grievance," *Joftes v. Kaufman*, 324 F. Supp. 660, 663 (D.D.C. 1971), as well as statements made "during the investigative phases of the process leading up to" a grievance hearing, *Cross v. Safeway, Inc.*, No. CIV. 03-132-TC, 2004 WL 1969407, at *4 (D. Or. Sept. 2, 2004), *Report and Recommendation adopted*, 2004 WL 2203257, at *1 (D. Or. Sept. 24, 2004). In fact, the privilege can even apply to statements made after a grievance hearing has concluded.[5]

---

[5]In *Cross*, an employer sent the union a letter describing the employer's "position on implementation of the arbitrator's order." 2004 WL 1969407, at *4. Even though the letter was sent after the arbitration hearing had concluded, the court held that the statement was nevertheless "made in the context of the ongoing resolution of a grievance" and therefore was absolutely privileged. *Id.*

Here, too, G4S sent the Kenealy report and the Seleman letter to Svendsen's union in the context of an ongoing attempt to address and resolve Svendsen's multiple grievances. Several facts make that clear.

For one thing, G4S did not send either document to the Union "*before* any grievance existed." *Mike*, 960 F. Supp. at 1399. G4S sent the Kenealy report to the Union three weeks after Svendsen filed his April grievance. And G4S sent the Seleman letter to the Union nine weeks after Svendsen filed his May grievance, six weeks after Svendsen filed his June grievance, and one week after Svendsen filed his July grievance.

In addition, G4S emailed the Kenealy report and the Seleman letter to the Union while the grievance process was ongoing. *See* ECF No. 70-3 at 16 (describing Svendsen's grievances as "unresolved" in June 2014). G4S sent the Kenealy report to the Union on May 5, three days before the May 8 meeting at which Svendsen and G4S reached a (short-lived) settlement of Svendsen's April grievance. And G4S sent the Seleman letter to the Union in July 2014, months before Svendsen and G4S finally settled Svendsen's grievances in February 2015.

Moreover, G4S emailed the Kenealy report and the Seleman letter to the Union *at the request of the Union* (acting on Svendsen's behalf). Svendsen's April grievance requested "[a] summary and description of all communications that G4S has had internally that refer or relate to this grievance," including an identification of every

person "that participated in this communication," "[a] copy of the document/writings/ memorandums and communications that refer or relate to this grievance or any discipline that G4S is intending to present the Grievant," "[a]ll and any documents that refer or relate to this grievance and issue," "a copy of any internal employer communications, e-mails, notes, documents, or memorandums," and "[a]ll and any documents the employer contends support its position on the grievance." ECF No. 71-3 at 3-4. G4S sent the Kenealy report to the Union in response to this document request. *See* Moryn Decl. ¶ 12; ECF No. 71-4 at 2-13; *cf.* ECF No. 70-9 at 114 (email from Svendsen to Kenealy stating that Svendsen wanted to "wait until" he and the Union got "the requested documents" before scheduling a meeting with Kenealy).

Similarly, Svendsen's July grievance requested "[a] summary and description of all communications that G4S has had internally that refer or relate to this grievance," "[a] copy of the document/writings/memorandums and communications that refer or relate to this grievance or any penalty that G4S is intending to present the Grievant," "[a]ll and any documents that refer or relate to this grievance and issue, including but not limited to, any employer policy that was applied or considered in the threat to terminate the Grievant and other defamatory actions taken by Seleman," "[a] copy of any internal employer communications, e-mails, notes, documents, or memorandums," "[a]ll and any documents th[at] G4S USA and Seleman contends support its position on

the grievance," and "[t]he entire body of the findings of the [Wackenhut] report and all internal comments . . . , including exhibits, interview notes, recordings, G4S official findings[,] . . . and any other . . . determinations of G4S . . . as applied to employee conduct in this matter."  ECF No. 71-7 at 2-3.  Earlier in July, Rojas had also asked Seleman to provide her with a copy of the "underlying statements, documents, and *termination notice* that G4S would rely upon in terminating Mr. Svendsen's employment if the grievances were not settled."  Seleman Decl. ¶ 14 (emphasis added).  G4S emailed the Seleman letter to the Union in response to these document requests.

Notably, G4S appears to have sent these documents only to persons within G4S and within the Union who had "a legitimate job-related interest" in receiving these documents.  *Hasten*, 640 F.2d at 279 (citation omitted).  Seleman sent the Seleman letter to only three people: Rojas (the Union lawyer who had been working on Svendsen's grievances and who had requested the document), Tanya Moryn (a human resources manager in G4S's Minneapolis office), and Isaac Luten (the general manager of G4S's Minneapolis office).  ECF No. 73-11 at 2-5.  And when Moryn forwarded the Kenealy report to Rojas, she likewise copied only three people on her email—Todd Dahlstrom (a Union representative), William Swafford (the operations manager of G4S's Minneapolis office), and Luten.  *See* ECF No. 71-4 at 2.  Neither the Kenealy report nor the Seleman letter was published to any third party.

Svendsen claims that the Kenealy report was "entirely unrelated . . . to the April grievance" and that the Seleman letter was "completely unnecessary" to resolve the July grievance. ECF No. 89 at 10, 14. That is simply not true; both communications were closely related to the grievance process.

Start with the Kenealy report. Svendsen's April grievance claimed that G4S had suspended him from Bearpath without cause. Everyone agreed that G4S had, indeed, suspended Svendsen at the March 31 meeting. But why? The Kenealy report was G4S's attempt to answer that question. To that end, the Kenealy report described the background leading up to the meeting—and, in particular, the problems that G4S had experienced with Svendsen that led Kenealy to request the March 31 meeting. *See* Moryn Decl. ¶ 12 (stating that G4S provided the Kenealy report to the Union "in response to Ms. Rojas's request for information pertaining to the April Grievance as these documents supported G4S's decision to remove Mr. Svendsen from his assignment"). True, Svendsen's suspension was for recording the March 31 meeting and not for the problems that led to the meeting, but in trying to negotiate a resolution of Svendsen's grievance, the parties had a legitimate interest in discussing the *reasons* for that meeting. That is why the Union requested—and G4S provided—documents such as the Kenealy report.

The Seleman letter, too, was closely related to the grievance process. A few days before Seleman sent Rojas the Seleman letter, Svendsen had filed a grievance claiming that G4S had violated the CBA by unlawfully threatening to fire him. Rojas had also asked for a copy of the termination notice that would be issued if G4S fired Svendsen. The Seleman letter explained why G4S believed it had lawful grounds to fire Svendsen. Plainly, then, the Seleman letter was G4S's response to Svendsen's July grievance[6] and to Svendsen's and the Union's accompanying document requests.

For these reasons, the Court concludes that the Kenealy report and the Seleman letter were absolutely privileged because they were statements made by an employer (G4S) to a union (SEIU Local 26) in connection with a grievance process.

*B. Settlement Privilege*

The Court agrees with G4S that the Seleman letter was absolutely privileged for a second reason: because it was a statement made by an attorney "during settlement negotiations preliminary to a proposed judicial proceeding." *Milavetz, Gallop & Milavetz, P.A. v. Hill*, No. CX-98-140, 1998 WL 422229, at *3 (Minn. Ct. App.

---

[6]Svendsen argues that G4S should not be allowed to rely on the July grievance because G4S sandbagged him by not producing a copy of the July grievance until late in the discovery process. But, of course, the grievance was filed by Svendsen's union on his behalf; he surely knew about it. Moreover, Svendsen answered questions about the July grievance at his deposition. In any event, even if the Court were to ignore the July grievance, the Seleman letter would still be privileged because it was sent by G4S to the Union as part of an ongoing attempt to settle the unresolved May and June grievances.

July 28, 1998).  Minnesota courts have long recognized an absolute privilege for statements that are "(1) made by a participating attorney, judge, judicial officer, or witness, (2) made in communications preliminary to, or in the course of, a judicial proceeding, (3) relevant to the subject matter of the litigation, and (4) protected in the interest of the administration of justice." *Ehrman v. Adam*, No. A08-2120, 2009 WL 2746749, at *3 (Minn. Ct. App. Sept. 1, 2009).  For the purposes of this privilege, the term "judicial proceedings" "may include an 'arbitration proceeding.'" *Id.* (quoting Restatement (Second) of Torts § 586 cmt. d (Am. Law Inst. 1977)).  "[R]elevance is defined broadly" to include not just statements that are "legally relevant" but "all statements that have reference, relation, or connection to the case." *Mahoney & Hagberg v. Newgard*, 729 N.W.2d 302, 308 (Minn. 2007).  And Minnesota courts have recognized that "[t]he policy considerations that underlie the absolute privilege for judicial-proceeding communications weigh in favor of applying the privilege to statements made during settlement negotiations" because lawyers should be given "full freedom of speech in conducting causes and advocating the rights of the parties they represent," and "settlements are forged by full and frank exchanges that may involve allegations of wrongdoing." *Ehrman*, 2009 WL 2746749, at *4 (citation omitted).

In this case, Seleman (a G4S attorney) sent the Seleman letter to Rojas (a Union attorney) as part of an ongoing attempt to settle Svendsen's grievances so that they

would not have to be resolved through arbitration or a judicial proceeding. Seleman

was a "participating attorney" because he had been assigned by G4S to work on the

case. *See* Seleman Decl. ¶¶ 5-19. The statements made in the Seleman letter were

communications made "preliminary to a proposed judicial proceeding" because they

were statements "made during settlement negotiations." *Ehrman*, 2009 WL 2746749, at

*4. Those statements were also relevant to the subject matter of the dispute because

they explained why G4S believed it had grounds to fire Svendsen if Svendsen's pending

grievances could not be settled. And finally, those statements should be "protected in

the interest of the administration of justice" because there is a policy interest in favor of

"allowing counsel [to] fully and frankly . . . discuss the facts underlying the litigation"

in order to "reach a fair and effective resolution" of a dispute. *Id.* at *3, 5.

The timeline of Seleman and Rojas's communications also makes it clear that the

Seleman letter was sent in the context of settlement negotiations. On July 15, Seleman

told Rojas that G4S was willing to pay Svendsen $9,000 to settle Svendsen's grievances.

On July 22, Rojas called Seleman back to communicate Svendsen's counteroffer of

nearly $30,000. Later that day, Seleman countered with an $11,000 offer. Then on

July 25, Rojas emailed Seleman back to tell him that Svendsen thought that $11,000 was

too low. In the same email, Rojas stated that Svendsen and the Union wanted more

information from G4S to help them evaluate G4S's settlement offer. ECF No. 73-10 at 2.

And finally, on July 30, Seleman replied to Rojas's July 25 email, attaching the Seleman letter "[p]er our prior communications."  ECF No. 73-11 at 2.

Rojas herself acknowledged that Seleman was communicating in the context of "settlement discussions."  ECF No. 72-2 at 102.  In an email to Svendsen, Rojas wrote: "My conversation with Fred [Seleman] was about the settlement proposals.  During this brief conversation he said that they had results from their investigation that were unfavorable and could potentially lead to disciplinary consequences . . . that . . . could range . . . up to termination."  ECF No. 72-2 at 107.

Under these circumstances, it is clear that the Seleman letter was a communication by one attorney to another as part of an ongoing attempt to settle several unresolved grievances.  The Seleman letter was thus absolutely privileged under Minnesota law as a pre-judicial-proceeding communication.

### C.  G4S's Other Arguments

G4S raises three other arguments in its summary-judgment motion:

First, G4S argues that Svendsen's defamation claim is barred by a six-month contractual-limitations period that Svendsen agreed to in his employment application. In response, Svendsen argues that it would be unfair to hold him to this contractual-limitations period because G4S did not give him a copy of his employment application when he exercised his right under Minnesota law to demand a copy of his personnel

file.  The Court need not resolve this dispute because Svendsen's defamation claim fails for other reasons.

Second, G4S argues that Svendsen's defamation claim is preempted by § 301 of the LMRA.  But "not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is pre-empted by § 301." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985).  Rather, the Court must determine whether resolution of the claim would "require the interpretation of some specific provision of a CBA." *Markham v. Wertin*, 861 F.3d 748, 755 (8th Cir. 2017) (citation omitted).  Here, the Court cannot identify any term in the CBA that would have to be interpreted in order to resolve Svendsen's defamation claim.

Third, G4S argues that some of the allegedly defamatory statements in the Seleman letter are not actionable because they "cannot be reasonably interpreted as stating a fact" and thus "cannot be proven true or false." *McKee v. Laurion*, 825 N.W.2d 725, 733 (Minn. 2013).[7]  The Court disagrees.  If the Seleman letter had merely accused Svendsen of being an "unpleasant" coworker, that might be a different story.  But among other things, the Seleman letter accused Svendsen of "suggest[ing] . . . that [he] could secretly take photos of Bear Path residents, unbeknownst to them."  ECF

---

[7]G4S also appears to argue that some of the statements in the Kenealy report and Seleman letter were not defamatory because they did not relate to the performance of Svendsen's trade, or because they were, in fact, true.  The Court need not address these arguments.

No. 73-11 at 5.  Whether or not Svendsen suggested to Kenealy or Berends that he could secretly take photos of Bearpath's residents without their permission is a question of fact that can be proven true or false.

*      *      *

In sum, the Court concludes that the Kenealy report and the Seleman letter were communications sent by G4S to Svendsen's union during and in connection with the grievance process.  The Seleman letter was also a communication made by a G4S attorney to a Union attorney in the course of settlement negotiations.  Both documents were therefore absolutely privileged, and G4S is entitled to summary judgment on Svendsen's defamation claim.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, the Court GRANTS defendant's motion for summary judgment [ECF No. 67].  Plaintiff's first amended complaint [ECF No. 34] is DISMISSED WITH PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.


 Dated:  September 13, 2018                    s/Patrick J. Schiltz
                                               Patrick J. Schiltz
                                               United States District Judge